HASBROUCK *v.* YOUNG.

*(Supreme Court, General Term, First Department.*   October 16, 1891.)

DEED—SETTING ASIDE—MENTAL CAPACITY—EVIDENCE.

Evidence of the existence in January of mental unsoundness so great as to incapacitate the grantor to transact any business will not warrant the setting aside of a deed made to his wife the preceding July, when there is no direct evidence as to his condition at that time, but all the evidence shows that his malady was of a progressive nature, and tends to show that it was not until the latter part of September that it became so serious as to incapacitate him.

Appeal from special term, New York county.

Action by Louis B. Hasbrouck, as assignee for the benefit of creditors of Richard D. Young, against Emma B. Young, to set aside a deed and bill of sale. There was judgment for plaintiff, and defendant appeals.

Argued before VAN BRUNT, P. J., and BARRETT and PATTERSON, JJ.

*John J. Adams,* for appellant. *Havens & Beebe,* (*A. Britton Havens,* of counsel,) for respondent.

PATTERSON, J. The learned judge before whom this cause was tried at the special term stated in his opinion very concisely both the question involved and the rule of its solution as follows, viz.: "The only question to be determined in this case is whether the plaintiff was at the times of the execution of the deed by which the house and lot described in the complaint was transferred to the defendant and the execution of the bill of sale on July 23, 1888, and of the assignment executed on January 10, 1889, of unsound mind; for it is an elementary principle of the common law that a gift or contract is invalid, unless the mind goes with the act, and this whether the actor is without mind, or of a mind not possessed of itself,—as under duress. *Riggs* v. *Society,* 84 N. Y. 336." Both parties have accepted that definition of the matter in contest, and each insists that upon the record nothing but issues of fact are raised. The suit was brought originally by Richard D. Young to set aside certain conveyances of real and personal property, made by him to and for the benefit of his wife, upon allegations that they were made and delivered while he was of unsound mind, and that they were procured to be made by undue influence of his wife, the defendant, while he was in that condition. Pending suit, Young made an assignment for the benefit of creditors, and the assignee, who was originally the attorney of record for Mr. Young in this action, has been substituted as plaintiff. This substitution operates no change in the issues. We are not now concerned with creditors, and are merely to ascertain whether, *inter partes,* these conveyances are valid. The learned judge in the court below found on all the material issues in favor of the plaintiff, and we are now called upon to review that decision, and to consider, analyze, and weigh all the evidence appearing on the record before us; and, having done so, we cannot resist the conclusion that on the facts the judgment must be reversed; for the evidence, as we think, not only fails to show that, as to the deed and bill of sale of July, 1888, Mr. Young was incompetent to make them, but, on the contrary, the preponderance of testimony clearly establishes that at that time he was *compos mentis,* and that the instruments assailed of that date, so far from being the acts of an irresponsible person, were made after due deliberation, inquiry, consultation with strangers, and with a fixed purpose to do so, as the wisest and best course a prudent and farsighted person would take in his own interest and that of his family, and that no coercion or undue influence whatever was used by the defendant. The utmost that can be said on the testimony is that at the date referred to Young was ill, dejected, and fearful as to his health and the future of his business. That his physical condition was impaired to some extent is clear, and it was evidently the consciousness of that fact that prompted his act.

That he subsequently became worse, until in September, 1888, his nervous state became serious, is also apparent; but it is likewise true that in July of that year he understood exactly his situation, and that what he then did was in anticipation and prevision of his becoming incapacitated, and not a consequence of an already existing incapacity. The proof shows clearly that in January, 1889, he was in such a state of mind as would possibly justify the judgment pronounced as to the bill of sale of that date; but the testimony of the physicians is that his nervous condition, which never really, on the evidence, amounted to insanity, was progressive; and it can almost be fixed to a certainty that if he were disqualified from doing business at all that disqualification dated only from September, 1888. A review of the evidence, we think, plainly shows the correctness of the conclusions we have reached, and all of that evidence has been carefully examined as bearing on the two material findings of fact of the court below relating to July, 1888, which are as follows: "*Fifth.* That from the spring of 1888 up to March, 1889, the said plaintiff had been in poor and deficient mental health and condition, and upon the dates mentioned, to-wit, the 23d day of July, 1888, and the 10th day of January, 1889, the plaintiff was mentally unsound, and incapable of appreciating the force, effect, and tenor of his acts, or of exercising his own will and judgment, and of withstanding the importunities, duress, and force or coercion of others. *Sixth.* That such conveyance and deed * * * were not the proper, free, and voluntary acts of the plaintiff, made while he was in full possession of his mental faculties, understanding, will, and judgment, but were so made while the plaintiff was in a weak and unsound mental condition, and as the result of the importunities and influence of the defendant, practiced upon him while the said plaintiff was so mentally unsound and incapable of exercising his own will, judgment, and understanding."

Bearing in mind that the present inquiry is addressed to what took place in July, 1888, and the then mental condition of Mr. Young, and nothing but that, we find almost a complete absence of testimony on the plaintiff's behalf relating directly and positively to that date, unless we take his own; and he swears he remembers nothing material about it. All there is upon which the plaintiff's case can be founded is the after-development of an admittedly progressive disease, without a single thing to show that by nec ssary relation his condition in January, 1889, was such that he could not have been *compos mentis* in July, 1888. The first witness called by the plaintiff was Joseph S. McGlynn, who acted as notary in taking the acknowledgment of the bill of sale in January, 1889. He took that acknowledgment, notwithstanding he swears he did not think Mr. Young was then responsible or rational. But this witness knew nothing of Young or his mental state in July, 1888. The next witness is Hasbrouck, who has filled the triple part of attorney, plaintiff, and witness. He swears distinctly he did not see Young in June or July, 1888, and had not seen him from October, 1887, to September, 1888. Then Dr. Birdsall was called, who never saw Young until September or October, 1888, and he candidly says he did not even then make a thorough examination of him, and that it was in the light of subsequent events that he made up his judgment as to Young's condition. Dr. O'Connor, another witness, never saw Mr. Young until January 10, 1889, and this physician very frankly says he could not tell whether the condition in which he then found the pati nt had continued a week or a month. Dr. Phillips never saw Young until the 4th October, 1888, when the latter went voluntarily to this physician's sanitarium, at Burn Brae, and the witness testifies as follows: "*Question. By the Court.* When he was brought there, how far had this disease gone? Was he at that time irrational? *Answer.* He never was irrational. He was always coherent." Dr. Jones, the next witness for the plaintiff, did not see Mr. Young until he was at Dr. Kirkbride's Asylum, January 26, 1889. This witness and Dr. Morrow alone give any color to the idea that Mr. Young was

disturbed mentally in July, and they are both very guarded in what they state. Dr. Jones says: "From the history he [Young] gave me, there was reason for his taking sulphonal in July. * * * I would say that his condition had existed six months prior to the time he came there, but only from the fact of his telling me that he had taken sulphonal for six months, and then I think he narrated other symptons of the trouble." Dr. Morrow's testimony is altogether too vague and uncertain as to time to be of any service. Taking all the facts and circumstances together, it is probable he attended Mr. Young in September, (and not in June or July,) before he went on his vacation, which he says began the last week in September. Dr. Helleck did not see Mr. Young until November, 1888, and he made up his judgment from what Dr. Birdsall wrote him, (what that was does not appear;) and Dr. Birdsall did not see Mr. Young until September or October, 1888. The other witnesses called by the plaintiff may be dismissed without particular notice. They deposed to nothing which would aid us in the precise inquiry now being made.

The foregoing is a general statement of all there is on the plaintiff's direct case to impeach the instruments of July, 1888, sought to be set aside. It is meager, inconclusive, vague, and altogether insufficient to reach the standard of judgment which the learned judge below very properly made the test of the rights of the parties; but when the testimony on behalf of the defendant, —some of it coming from disinterested persons, (that of the defendant and the children being discarded,)—and the letters in evidence, written by Mr. Young during the period of time in question, are considered, it seems impossible to resist the conclusion that he was not only sane on July 23, 1888, but that he was in full possession of his mental faculties, and that he himself instigated the making of the instruments of that date. His letters are characterized by a style that evinces he was a man of education, writing deliberately and calmly, and that he was conscious of his surroundings and situation. They are lucid, and well written; but, putting them aside, and still confining the inquiry to July, 1888, and closely examining the testimony of merely impartial witnesses, or those whose interests cannot in any way be affected by the result of this case, the conclusion we have reached seems to be inevitable. The transfer of the house, etc., was made through an intermediary,—Miss Helitt. She gives a very clear and inherently probable account of the transaction. Mrs. Young (the defendant) had written her that Mr. Young desired to put the house in the name of a third party, and asked her to meet the writer of that letter and her husband at a lawyer's office on a day named. She came to New York, and met Mr. and Mrs. Young, and Mr. Young took them to the office of Mr. Bright, a lawyer, and the deeds were executed. She was thanked for her kindness, and went away. It is perfectly clear that this young lady had nothing to do with the matter, except to carry out the wishes of her friends. There was neither previous consultation, nor prearrangement, nor anything that could associate her with an attempt on the part of Mrs. Young to get possession of the property. Her testimony seems to have been given in a frank, clear, and impartial way, and, so far as we can judge from a printed record, it is quite evident the part she played in the transaction was that of an inexperienced and complaisant young woman, who was glad to oblige her friends. How, then, did she come to render this service, and what induced it? The letter from Mrs. Young notified her of the desire to have her act; but Mr. Bright's testimony illuminates the whole transaction, and shows that the scheme and the method of its accomplishment was the work of Mr. Young, and no one else. This witness is connected with the title guaranty and trust company. About the middle of July, 1888, Mr. Young applied to him for a loan upon the real property in question. He stated all the particulars, the previous incumbrances, and that he thought of putting the house in the name of his wife, and asked what would be the best way of doing it. The witness

told him the best thing he could do would be to get an unmarried woman to take the title, and have her reconvey it to Mrs. Young. This is clearly the advice, after consultation, on which Mr. Young acted. He sought it of his own motion, and said he would see Mrs. Young about getting a suitable person, and afterwards he told the witness that they had agreed upon Miss Helitt, and that is doubtless the way she came into the business. Mr. Young was unaccompanied when he had these conversations with Bright. His wife was not present, and had nothing to do with them. He acted independently, and was informed of the whole relation of the company to a transaction of that kind. He was even told the views the company's officers held of the effect of a gift to a wife as relating to the rights of creditors and the rules of the company. The testimony as it stands is quite convincing that the judgment, so far as the instruments of July, 1888, are concerned, is wrong. The case was determined on the theory that there is no distinction to be made between the transaction of January, 1889, and that of July, 1888. We think there is, and that a reading of the record discloses it unmistakably, and therefore the judgment must be reversed, and a new trial ordered, with costs to abide the event.

BARRETT, J. I concur. I am entirely satisfied, however, that the evidence sustains the findings as to the bill of sale of the business, which was executed on the 10th day of January, 1889; but I think it insufficient with regard to the transactions of the 23d day of July, 1888.

VAN BRUNT, P. J., concurs.